**ORAL ARGUMENT NOT YET SCHEDULED**
**No. 23-7044 (Related Case: 23-7041)**

# In the United States Court of Appeals
# for the District of Columbia Circuit

UNITED STATES OF AMERICA EX REL.
MARK J. O'CONNOR AND SARA F. LEIBMAN,

*Plaintiffs-Appellants,*

v.

USCC WIRELESS INVESTMENT, INC., ET AL.,

*Defendants-Appellees.*

Appeal from the U.S. District Court for the District of Columbia
Case No. 20-cv-2071 (Hon. Tanya S. Chutkan, J.)

## BRIEF FOR PLAINTIFFS-APPELLANTS

Sara M. Lord
James R. Wiseman
ARNALL GOLDEN GREGORY, LLP
2100 Pennsylvania Ave. NW
Suite 350S
Washington, DC 20006
(202) 677-4054
sara.lord@agg.com
james.wiseman@agg.com

Benjamin J. Vernia
THE VERNIA LAW FIRM
1455 Pennsylvania Ave. NW
Suite 400
Washington, DC 20004
(202) 349-4053
bvernia@vernialaw.com

Daniel Woofter
GOLDSTEIN, RUSSELL &
    WOOFTER, LLC
1701 Pennsylvania Ave. NW
Suite 200
Washington, DC 20006
(202) 240-8433
dhwoofter@goldsteinrussell.com

*Attorneys for Plaintiffs-Appellants Mark J. O'Connor and Sara F. Leibman*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Plaintiffs-Appellants certify as follows:

**(A)    Parties and *amici*.** The defendants in the district court, and the appellees here, are USCC Wireless Investment, Inc.; Telephone and Data Systems, Inc.; King Street Wireless, LP; Allison Cryor DiNardo; United States Cellular Corporation; King Street Wireless, Inc.; Carroll Wireless, LP; Carroll PCS, Inc.; Barat Wireless, LP; Barat Wireless, Inc. The plaintiffs/relators in the district court, and appellants here, are Mark J. O'Connor; and Sara F. Leibman.

**(B)    Rulings Under Review**. The rulings under review are the district court's March 22, 2023 memorandum opinion and order granting defendants' motions to dismiss the complaint, *see* Dkt. Nos. 165, 166, published as *United States ex rel. O'Connor v. U.S. Cellular Corp.*, No. 20-cv-2071, 2023 WL 2598678 (D.D.C. Mar. 22, 2023) (Chutkan, J.).

**(C)    Related Cases**. This case has not been before this or any other court. Related case *United States ex rel. O'Connor v. U.S. Cellular Corp.*, No. 20-cv-2070 (D.D.C.), is on appeal in this Court in No. 23-7041,

for which oral argument will be held on the same day before the same panel. *See* Doc. #2008930 (July 21, 2023 Order).

Plaintiffs are unaware of any other related cases pending before this Court, any other U.S. court of appeals, or any local or federal court in the District of Columbia.

Dated: February 2, 2024              /s/ Daniel Woofter
                                                       Daniel Woofter

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................vi

INTRODUCTION ............................................................................... 1

JURISDICTIONAL STATEMENT ....................................................... 3

ISSUES PRESENTED ........................................................................ 4

STATUTES AND REGULATIONS ...................................................... 4

STATEMENT OF THE CASE ............................................................. 5

   I.  LEGAL BACKGROUND .......................................................... 5

      A. The False Claims Act and the Public Disclosure Bar ................. 5

      B. FCC Designated Entity Program ............................................... 12

   II.  FACTUAL BACKGROUND ....................................................... 18

      A. Plaintiff O'Connor's Original *Qui Tam* Action Alleged a Fraud to *Obtain* Licenses at a Discount. .................................... 19

      B. This *Qui Tam* Action Alleges a Scheme to Fraudulently *Retain* Hundreds of Millions of Dollars in Bid Credits. ............ 23

   III. PROCEDURAL HISTORY ....................................................... 29

STANDARD OF REVIEW ................................................................. 32

SUMMARY OF ARGUMENT ............................................................ 32

ARGUMENT .................................................................................... 39

   I.  THE 2008 COMPLAINT DOES NOT BAR THE CURRENT 2020 COMPLAINT. ...................................................................... 40

      A. Plaintiff O'Connor is an Original Source of the Fraud Allegations in the 2008 Complaint. ......................................... 40

      B. The Allegations in the 2008 Complaint Did Not Disclose the Allegations in the 2020 Complaint. ................................... 45

   II.  PLAINTIFFS ARE ORIGINAL SOURCES OF THE ALLEGATIONS IN THE 2020 COMPLAINT. ..................................................... 50

      A. Plaintiffs' Independent Knowledge "Materially Adds" to the Allegations in the 2008 Complaint. .................................... 51

iv

B. The Information in the Public Domain Did Not Disclose the Frauds Alleged in the 2020 Complaint. ..............................57

CONCLUSION ...........................................................................66

ADDENDUM ........................................................................... A1

# TABLE OF AUTHORITIES

## Cases

*A-1 Ambulance Serv., Inc. v. California*,
202 F.3d 1238 (9th Cir. 2000)..............................................................61

*ASARCO, LLC v. Union Pac. R. Co.*,
765 F.3d 999 (9th Cir. 2014)................................................................32

*Bowden v. United States*,
106 F.3d 433 (D.C. Cir. 1997)..............................................................32

*Cook County v. United States ex rel. Chandler*,
538 U.S. 119 (2003).................................................................................5

*Gonzalez v. Planned Parenthood of Los Angeles*,
392 F. App'x 524 (9th Cir. 2010) ...................................................34, 43

*Graham Cnty. Soil & Water Conservation Dist. v.
United States ex rel. Wilson*, 559 U.S. 280 (2010) ...............................7

*Schindler Elevator Corp. v. United States ex rel. Kirk*,
563 U.S. 401 (2011)..........................................................................7, 45

*Shea v. Verizon Commc'ns, Inc.*,
160 F. Supp. 3d 16 (D.D.C. 2015), *aff'd sub nom. United States ex rel.
Shea v. Cellco P'ship*, 863 F.3d 923 (D.C. Cir. 2017)....................34, 42

*\*Silbersher v. Valeant Pharms. Int'l, Inc.*,
76 F.4th 843 (9th Cir. 2023) ...................................................39, 57, 59

*Sturgeon v. Pharmerica Corp.*,
438 F. Supp. 3d 246 (E.D. Pa. 2020) ...................................................62

*United States ex rel. Ambrosecchia v. Paddock Lab'ys, LLC*,
855 F.3d 949 (8th Cir. 2017)...............................................................52

*United States ex rel. Baker v. Cmty. Health Sys., Inc.*,
709 F. Supp. 2d 1084, 1100 (D.N.M. 2010), *opinion vacated in part on
other grounds* 2014 WL 10212869 (D.N.M. Sept. 15, 2014)..........34, 44

Authorities upon which we chiefly rely are marked with asterisks.

*United States ex rel. Cooper v. Blue Cross & Blue Shield of Fla., Inc.*,
19 F.3d 562 (11th Cir. 1994).................................................................61

*United States ex rel. Feingold v. AdminaStar Fed., Inc.*,
324 F.3d 492 (7th Cir. 2003).................................................................62

*United States ex rel. Fisher v. JPMorgan Chase Bank N.A.*,
413 F. Supp. 3d 569 (E.D. Tex. 2019)...........................................34, 44

*United States ex rel. Foreman v. AECOM*,
19 F.4th 85 (2d Cir. 2021)....................................................................59

*United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*,
874 F.3d 905 (6th Cir. 2017).................................................................61

*United States ex rel. Mateski v. Raytheon Co.*,
816 F.3d 565 (9th Cir. 2016).................................................................11

**United States ex rel. Maur v. Hage-Korban*,
981 F.3d 516 (6th Cir. 2020).............................................36, 37, 49, 52

**United States ex rel. Minnesota Ass'n of Nurse Anesthetists v.
Allina Health Sys. Corp.*,
276 F.3d 1032 (8th Cir. 2002).........................................................42, 44

**United States ex rel. Moore & Co. v. Majestic Blue Fisheries, LLC*,
812 F.3d 294 (3d Cir. 2016).......................................................10, 53, 56

*United States ex rel. Oliver v. Philip Morris USA Inc.*,
763 F.3d 36 (D.C. Cir. 2014).................................................................59

*United States ex rel. Osheroff v. Tenet Healthcare Corp.*,
2012 WL 2871264 (S.D. Fla. July 12, 2012) ........................................63

*United States ex rel. Prather v. AT&T, Inc.*,
847 F.3d 1097 (9th Cir. 2017)...............................................................32

*United States ex rel. Rabushka v. Crane Co.*,
40 F.3d 1509 (8th Cir. 1994).................................................................61

**United States ex rel. Rahimi v. Rite Aid Corp.*,
3 F.4th 813 (6th Cir. 2021) ............................................................37, 53

**United States ex rel. Reed v. KeyPoint Gov't Sols.*,
923 F.3d 729 (10th Cir. 2019)............................................32, 37, 53, 55

vii

*United States ex rel. Settlemire v. District of Columbia*,
198 F.3d 913 (D.C. Cir. 1999)..................................................35, 47, 49

*\*United States ex rel. Springfield Terminal Ry. Co. v. Quinn*,
14 F.3d 645 (D.C. Cir. 1994)......................11, 33, 38, 39, 40, 42, 59, 62

*United States ex rel. Winkelman v. CVS Caremark Corp.*,
827 F.3d 201 (1st Cir. 2016) ...............................................................52

*United States v. Bank of Farmington*,
166 F.3d 853 (7th Cir. 1999), *overruled on other grounds by Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907 (7th Cir. 2009) ............64

*United States v. Comstor Corp.*,
308 F. Supp. 3d 56 (D.D.C. 2018)...................................................39, 40

*United States v. Educ. Mgmt. LLC*,
2014 WL 2766115 (W.D. Pa. June 18, 2014) ................................34, 44

## Statutes

28 U.S.C. § 1291...................................................................................3

28 U.S.C. § 1331...................................................................................3

31 U.S.C. § 3729(a)(1)(A)..................................................................5, 19

31 U.S.C. § 3729(a)(1)(B)..................................................................5, 19

31 U.S.C. § 3729(a)(1)(C)..................................................................5, 19

31 U.S.C. § 3729(a)(1)(G)..............................................................5, 19, 48

31 U.S.C. § 3730(b)(1)............................................................................6

31 U.S.C. § 3730(b)(4)............................................................................6

31 U.S.C. § 3730(d)................................................................................6

31 U.S.C. § 3730(e)(4)...............................................11, 41, 58, 60, 61

31 U.S.C. § 3730(e)(4) (1986)................................................................7

31 U.S.C. § 3730(e)(4)(A).................................2, 3, 35, 38, 45, 48

31 U.S.C. § 3730(e)(4)(B).................................2, 3, 12, 33, 36, 41, 50

31 U.S.C. § 3732....................................................................................3

47 U.S.C. § 309(j)(4)(C)........................................................................13

47 U.S.C. § 309(j)(4)(D) .......................................................................13

Act of Dec. 23, 1943, ch. 377, 57 Stat. 608...................................................6

Patient Protection and Affordable Care Act,
    Pub. L. No. 111-148, 124 Stat. 119 (2010) ............................................9

## Regulations

47 C.F.R. § 1.2110(b)(3)(iv)(A)......................................................15, 17, 24

47 C.F.R. § 1.2105 .......................................................................................15

47 C.F.R. § 1.2110 .......................................................................................17

47 C.F.R. § 1.2110(b) ......................................................................13, 16, 17

47 C.F.R. § 1.2110(c)(2) ..............................................................................14

47 C.F.R. § 1.2110(c)(2)(ii)(H) ...................................................................15

47 C.F.R. § 1.2110(c)(5)(i) ...........................................................................14

47 C.F.R. § 1.2110(j) ....................................................................................13

47 C.F.R. § 1.2110(n) .............................................................................13, 16

47 C.F.R. § 1.2111 ........................................................................................13

47 C.F.R. § 1.2112(b)(2) ..............................................................................16

47 C.F.R. § 1.2114(a) ...................................................................................17

47 C.F.R. § 1.65...........................................................................................22

47 C.F.R. § 1.7001(b) ..................................................................................56

47 C.F.R. § 24.321(a)(2) ..............................................................................14

47 C.F.R. § 27.1102(a)(2) ............................................................................14

47 C.F.R. § 27.14(g)(1) ................................................................................18

47 C.F.R. § 27.14(k) ....................................................................................18

47 C.F.R. § 27.502(a)(2) ..............................................................................14

47 C.F.R. §1.2110(b)(1)(i) ...........................................................................14

Competitive Bidding Proceeding,
    63 Fed. Reg. 2,315 (Jan. 15, 1998) ......................................................16

## Rules

Fed. R. App. P. 4(a)(1)(A) ............................................................... 3

Fed. R. Civ. P. 12(b)(6) .................................................................. 32

## Other Authorities

145 Cong. Rec. E1546-01 (daily ed. July 14, 1999),
1999 WL 495861 ....................................................... 8, 9, 39, 60, 64, 66

155 Cong. Rec. S13661-01 (daily ed. Dec. 21, 2009), 2009 WL 4906975 10

*In re Promoting Interoperability in the 700 Mhz Com. Spectrum*,
27 FCC Rcd. 3521 (Mar. 21, 2012) ............................................... 31, 63

*Lampert & O'Connor, P.C. v. Carroll Wireless, L.P.*,
No. 1:07-cv-800 (JDB) (D.D.C. May 2, 2007) ................... 20, 22, 23, 41

S. Rep. No. 110-507 (2008) ....................................................... 8

S. Rep. No. 99-345 (1986) ....................................................... 6, 7, 45, 66

# GLOSSARY

DOJ         Department of Justice

FCA         False Claims Act

FCC         Federal Communications Commission

JA          Joint Appendix

## INTRODUCTION

This case and the related case on appeal before this Court in No. 23-7041, arise under the False Claims Act, 31 U.S.C. §§ 3729-33 (FCA). Plaintiffs-appellants—telecommunications attorneys with deep background in telecommunications law—determined through careful analysis of defendants-appellees' submissions to the Federal Communications Commission (FCC), as well as additional sources and independent investigation, that defendants deceived the FCC in two ways. First, they lied to the FCC to obtain wireless spectrum licenses at substantial discounts, amounting to hundreds of millions of dollars in benefits for which they were not eligible. Second, defendants then misled the Government for years to cover up the fraud and avoid continuing obligations so they would not have to pay back discounts they fraudulently obtained. Plaintiffs brought an FCA action as *qui tam* relators to help the Government recover these losses.

These appeals concern an affirmative defense called the "public disclosure bar," which generally requires dismissal of FCA actions "if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed" in specified forums, "unless the action

1

is brought by the Attorney General or the person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4)(A). There are two paths to "original source" status. The first is available to an individual who "(i) prior to a public disclosure … has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based." *Id.* § 3730(e)(4)(B). The second path is available to an individual who (ii) "has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions" and provided "the information to the Government before filing an action under this section." *Ibid.*

The district court granted defendants' motions to dismiss based solely on the public disclosure bar. The court believed that the unsealing of a previous *qui tam* case filed by plaintiff Mark O'Connor and his prior law firm in 2007 barred him (and thus anyone else) from ever alleging that these defendants had engaged in schemes to fraudulently obtain spectrum licenses at discounts, then fraudulently retain the benefits.

This Court should reverse for three independent reasons. First, regardless of all else, under the first path to "original source" status, plaintiff O'Connor is and always will be an original source of the

2

allegations in the earlier *qui tam* case that *he* filed under seal and later dismissed without prejudice, because "prior to" the unsealing that publicly disclosed his allegations, he "voluntarily disclosed to the Government the information on which allegations or transactions" within that complaint "are based." 31 U.S.C. § 3730(e)(4)(B). Second, the fraudulent scheme to *obtain* the discounted licenses alleged in the previous *qui tam* action is not "substantially the same" as the separate fraud scheme to *retain* the discounts alleged here. *Id.* § 3730(e)(4)(A). Third, under the second path to "original source" status, plaintiffs' independent knowledge of defendants' post-licensing frauds "materially adds" to the allegations previously disclosed. *Id.* § 3730(e)(4)(B).

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over plaintiffs' federal claims under 28 U.S.C. § 1331 and 31 U.S.C. § 3732. It entered final judgment in defendants' favor on March 22, 2023. JA950. Plaintiffs timely filed their notice of appeal on April 17, 2023. JA951; *see* Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.  Whether the district court erred in finding that the unsealing of a previous *qui tam* complaint brought by one of the plaintiffs here barred plaintiffs from filing their current claims under the False Claims Act.

2.  If the previous complaint is a public disclosure of allegations for which plaintiffs are not an original source: Whether plaintiffs' allegations of post-licensing fraud are "substantially the same" as the publicly disclosed allegations of pre-licensing fraud in the earlier case.

3.  If the previous complaint is a public disclosure of allegations for which plaintiffs are not an original source, *and* plaintiffs' allegations of post-licensing fraud are "substantially the same" as the publicly disclosed allegations of pre-licensing fraud: Whether the district court erred in finding that plaintiffs' independent knowledge of defendants' post-licensing fraud did not "materially add" to the allegations of pre-licensing fraud previously disclosed to the public.

## STATUTES AND REGULATIONS

Pertinent statutory and regulatory authority is reproduced *infra* pp.A1-A24.

4

## STATEMENT OF THE CASE

I. **LEGAL BACKGROUND**

    **A.    The False Claims Act and the Public Disclosure Bar**

Relevant here, the FCA creates civil liability for "any person" who "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"—"(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim"—or, in what is known as a reverse false claim, "(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government," or "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(A), (B), (G). The statute also reaches anyone who "conspires to commit a violation" of any of those subparagraphs. *Id.* § 3729(a)(1)(C).

In enacting the statute, "Congress wrote expansively, meaning to reach all types of fraud, without qualification, that might result in financial loss to the Government." *Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003) (quotation marks omitted).

5

The FCA's most distinctive feature is that it authorizes suits by private persons, known as *qui tam* relators, on the Government's behalf. *See* 31 U.S.C. § 3730(b)(1). After a relator files suit, the Government has the option to intervene, or to allow the relator to carry the suit forward instead. *See id.* § 3730(b)(4). At the end of a successful case, the Government receives the lion's share of the recovery, and the relator may receive up to 30%. *See id.* § 3730(d). The *qui tam* provisions are designed to "encourage any individual knowing of Government fraud to bring that information forward." S. Rep. No. 99-345, at 2 (1986).

The *qui tam* provision has some limitations. One is the "public disclosure bar." The bar was inserted into the statute in 1986. Previously, the statute included a "Government knowledge bar," which precluded *qui tam* suits "whenever it shall be made to appear that such suit was based upon evidence or information in the possession of the United States, or any agency, officer or employee thereof, at the time such suit was brought." Act of Dec. 23, 1943, ch. 377, § 1, 57 Stat. 608, 609.

In 1986, Congress determined that the "growing pervasiveness of fraud necessitate[d] modernization" of the FCA. S. Rep. No. 99-345, at 2. Congress was particularly concerned that "restrictive court

interpretations of the act ha[d] emerged which tend to thwart the effectiveness of the statute" by dismissing meritorious cases, including by reading the government knowledge bar too broadly. *See id.* at 4; *see also Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 294 (2010). The legislature therefore amended the statute to encourage more private enforcement suits.

As relevant here, Congress replaced the Government "knowledge" bar with the "public disclosure" bar. Rather than bar every suit that incorporated information in the Government's possession, the public disclosure bar provided that when the fraud alleged in a relator's complaint had been "publicly disclosed" in specific, enumerated ways, the *qui tam* action must be dismissed unless the relator was an "original source" of the information underlying the complaint. *See* 31 U.S.C. § 3730(e)(4) (1986).

The public disclosure bar sought "to strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits." *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 413 (2011) (quotation marks and emphasis removed). But, consistent with the reasons Congress amended the statute in 1986, that

7

balance favors enforcement. "In creating both the public disclosure bar and the original source exception," Congress sought "to only bar truly 'parasitic' lawsuits, such as those brought by individuals who did nothing more than copy a criminal indictment filed by the Government." S. Rep. No. 110-507, at 22 (2008). On the other hand, Congress sought "to ensure that any individual *qui tam* relator who came forward with legitimate information that started the Government looking into an area it would otherwise not have looked, could proceed with an FCA case." *Id.* at 5.

Unfortunately, courts still misapplied the public disclosure bar to dismiss meritorious cases. This prompted the sponsors of the 1986 Amendments to explain that the public disclosure bar, "which was drafted to deter so-called 'parasitic' cases, has been converted by several circuit courts into a powerful sword by which defendants are able to defeat worthy relators and their claims," in a manner that threatened to undermine "the very purpose" of the 1986 Amendments. 145 Cong. Rec. E1546-01 (daily ed. July 14, 1999), 1999 WL 495861, at *E1546.

In particular, the legislators "disagree[d] with cases holding that *qui tam* suits are barred if the relator obtains some, or even all, of the information necessary to prove fraud from publicly available documents."

8

145 Cong. Rec. E1546-01, at *E1547. In their view, a relator "who uses their education, training, experience, or talent to uncover a fraudulent scheme from publicly available documents, should be allowed to file a *qui tam* action." *Ibid.* "This is especially true where a relator must piece together facts exposing a fraud from separate documents." *Ibid.*

The public disclosure bar's architects also disagreed with decisions interpreting the original source provision—which at the time required the relator to have "direct and independent" knowledge of the fraud—to "require[] the relator to be an eyewitness to the fraudulent conduct as it occurs." 145 Cong. Rec. E1546-01, at *E1547. This interpretation threatened to "undermine Congress' explicit goals." *Ibid.* Instead, they argued:

> [A] relator's knowledge of the fraud is "direct and independent" if it results from his or her own efforts. For example, a relator who learns of false claims by gathering and comparing data could have direct and independent knowledge of the fraud, regardless of his or her status as a [percipient] witness.

*Ibid.*

In response to decisions misconstruing the public disclosure bar, Congress amended the statute in 2010 as part of the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010).

9

Congress "overhauled" and "radically changed" the statute to "lower the bar for relators." *United States ex rel. Moore & Co. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 298-99 (3d Cir. 2016). Part of Congress's goal was to "appropriately empower whistleblowers to come forward to expose fraud, which is a crucial way to save the government money and ensure the health and well-being of Americans." 155 Cong. Rec. S13661-01 (daily ed. Dec. 21, 2009), 2009 WL 4906975, at *S13693 (statement of Sen. Leahy).

As amended, the public disclosure bar provides that:

(A) The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—

> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
>
> (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
>
> (iii) from the news media,

unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under

subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or ([ii]) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C. § 3730(e)(4).

Two changes are salient here. First, rather than having the public disclosure bar triggered whenever the plaintiff's allegations are "based upon" the publicly disclosed allegations or transactions, Congress provided that the publicly disclosed allegations or transactions must be "substantially the same" as those alleged in the complaint. This means that all the material elements of the fraud must be "substantially the same" as those transactions publicly disclosed before the public disclosure bar is triggered. *See United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 655 (D.C. Cir. 1994) (so holding under the pre-amended version of the statute; *see also United States ex rel. Mateski v. Raytheon Co.*, 816 F.3d 565, 571 (9th Cir. 2016).

Additionally, the definition of "original source" changed substantially. Rather than require relators to have direct and independent knowledge of the information on which the allegations are

11

based, and to provide that information to the Government before suing, the exception now applies in two distinct situations: (1) if the relator voluntarily discloses "the information on which allegations or transactions in a claim are based" to the Government before a public disclosure occurs; or (2) if the relator "has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions," and voluntarily communicates that "information to the Government before filing an action under this section." 31 U.S.C. § 3730(e)(4)(B).

Under the first path, relators who communicate the information underlying their claims to the Government inoculate themselves from subsequent public disclosures. Under the second path, relators who have independent, materially valuable knowledge may proceed if they provide their information to the Government before suing—even though the material elements of the fraud were already publicly disclosed.

**B.    FCC Designated Entity Program**

Enabling everything from cellular communications to broadcast television, wireless spectrum is a *finite* public good with extraordinary value. To allocate this important resource fairly, Congress authorized the

FCC to auction spectrum licenses and directed it to establish mechanisms to help level the playing field for, among others, small wireless services companies. *See* 47 U.S.C. § 309(j)(4)(D).

To promote the participation of small businesses in spectrum auctions, as Congress directed, the FCC established the "Designated Entity" program, which provides "bidding credits" to small or very small businesses. *See* 47 C.F.R. § 1.2110(b);[1] *see also* 47 U.S.C. § 309(j)(4)(C)-(D). To ensure that bid credits flow to small and very small businesses—and not to large companies seeking to game the system—the FCC established strict eligibility requirements for designated entities, as well as a five-year "unjust enrichment" period during which, to retain the bid credits, a designated entity must continue to meet the eligibility requirements. 47 C.F.R. §§ 1.2110(b), 1.2111. To qualify for, and to retain bid credits, designated entities must certify that they are eligible for designated-entity status, first, in bidding and licensing applications, and then, in Annual Reports filed with the FCC during the unjust enrichment period. *Id.* §§ 1.2110(b), (j), (n); 1.2111.

---

[1]     Unless otherwise noted, all Code of Federal Regulation citations refer to the regulations in force during the relevant period.

### 1.    *Eligibility requirements*

For the auctions at issue here, the FCC provided 25% bid credits to "very small businesses" whose aggregated "attributed revenues" for the previous three years did not exceed $15 million. 47 C.F.R. §§ 24.321(a)(2), 27.502(a)(2), 27.1102(a)(2). Aggregated attributable revenues included an entity's revenue, *plus* the revenues of "its affiliates, its controlling interests, the affiliates of its controlling interests, and the entities with which it ha[d] an attributable material relationship." *Id.* § 1.2110(b)(1)(i).

An "affiliate" was one who "[d]irectly or indirectly" controlled or had the power to control the applicant; was controlled by the applicant; was controlled by a third party that also controlled or had the power to control the applicant; or had an "identity of interest," such as a "joint venture," with the applicant. 47 C.F.R. § 1.2110(c)(5)(i).

A "controlling interest" was one with either *de jure* or *de facto* control of the applicant. 47 C.F.R. § 1.2110(c)(2). A controlling interest also existed when a management agreement authorized another to make decisions or engage in practices or activities that determined or significantly influenced: (1) the nature or types of services offered by the

licensee; (2) the terms on which the services are offered; or (3) the prices charged for such services. *Id.* § 1.2110(c)(2)(ii)(H).

And an "attributable material relationship" existed when an applicant or licensee had one or more agreements with any individual or entity for the lease or resale of, on a cumulative basis, more than 25% of the spectrum capacity of *any individual license* held by the applicant or licensee. 47 C.F.R. § 1.2110(b)(3)(iv)(A). Thus, for example, if a designated entity were to allow an ineligible entity like USCC to use more than 25% of the spectrum of *any one* of its licenses during the unjust enrichment period, the licensee would have to pay back some or all of the bid credits used to purchase *all* of its licenses. *See ibid.*

## 2.    *Pre- and post-auction qualification and licensing procedures*

To establish their eligibility under these rules, applicants were required to provide and certify detailed information about their finances and business relationships. All would-be bidders had to submit a streamlined, short-form application, which the FCC relied on to determine whether they were eligible to participate in the auction and whether they could bid with bid credits as a "designated entity." *See* 47 C.F.R. § 1.2105 ("Bidding application and certification procedures").

15

Post-auction, the winning bidders had to submit a more comprehensive long-form application for the licenses they won, which the FCC relied on to determine whether they were qualified to hold the licenses and whether they were, in fact, eligible to use bid credits as a designated entity. *See id.* § 1.2112(b)(2) (listing information designated entities must include with a long-form "application for a license").

The post-licensing unjust enrichment period existed to "ensure that meaningful small business participation in spectrum-based services [wa]s not thwarted by transfers of licenses to non-designated entities," or by designated entities changing ownership in a manner that "would result in the licensee no longer qualifying for a bidding credit." Competitive Bidding Proceeding, 63 Fed. Reg. 2,315, 2,320-21 (Jan. 15, 1998). Thus, designated entities had to file "Annual Reports" throughout the unjust enrichment period expressly certifying that they continued to hold the controlling interest in the licenses, and to list and summarize all the agreements that related to their eligibility as a designated entity, including any new agreements they might have since entered. 47 C.F.R. §§ 1.2110(b), (n), 1.2111(b)(1).

During the unjust enrichment period, designated entities also had to report any event that would affect their eligibility to retain their bid credits as those events arose. 47 C.F.R. § 1.2114(a). As noted above, this included any lease of spectrum that caused the lessee and lessor to have an "attributable material relationship." *Id.* § 1.2110(b)(3)(iv)(A). Again, if a designated entity transferred control of a license during the unjust enrichment period to an entity that did not itself qualify for discounted licenses, the licensee was required to repay some or all of the bid credits for all of its licenses based on the amount of time remaining in the unjust enrichment period. *See id.* §§ 1.2110, 1.2111(d).

Once the unjust enrichment period ended, a designated entity could assign or transfer control of a license without any loss of benefits or payment of penalties—and even then, only with the approval of the FCC.

### 3. *Post-licensing "buildout" requirements*

All winning bidders in Auctions 58 and 73, including designated entities like defendants Barat Wireless, L.P., and King Street Wireless, L.P., had to use the licenses they purchased or risk forfeiting the licenses early. This ensured that a designated entity did not simply hold licenses

17

for the benefit of an ineligible company until the end of the unjust enrichment period—with no benefit to the public in the meantime.

Thus, the FCC required all Auction 58 and 73 licensees to satisfy certain "buildout" requirements, to meet specified network coverage requirements and offer service within a given period. King Street, for example, was required to provide reliable signal coverage and offer service to at least 35% of the population in each of its licensed areas within four years, and to at least 70% of the population within ten. 47 C.F.R. § 27.14(g)(1). Failure to meet those buildout requirements would result in the early termination of King Street's licenses. *Ibid*.

To enforce these requirements, King Street was required to file "Construction Notices" with the FCC expressly certifying that it was meeting its buildout obligations. 47 C.F.R. § 27.14(k).

## II. FACTUAL BACKGROUND

Defendant USCC is one of the largest wireless services companies in the United States, with billions of dollars in annual revenues—far exceeding the maximum revenue permitted for a small business seeking bidding credits from the Government. Plaintiffs allege that defendants conspired to use sham "very small businesses" to obtain licenses for

USCC with over $163 million in bid credits from the Government. *See* JA28¶1. None of these businesses ever provided wireless services to the public, and USCC, first secretly and then formally, incorporated their spectrum into its own network during the unjust enrichment periods. JA28¶¶2-3.

Thus, on top of *obtaining* the licenses by fraud in violation of the FCA, 31 U.S.C. § 3729(a)(1)(A)-(C), as plaintiff O'Connor alleged in the original *qui tam* action he brought in 2007, defendants then fraudulently *retained* the bid-credit discounts, violating different FCC regulations and a separate "reverse false claim" provision of the FCA, *see* 31 U.S.C. § 3729(a)(1)(C), (G). Plaintiffs discovered, after plaintiff O'Connor had voluntarily dismissed his original *qui tam* action without prejudice, that the sham designated entities filed numerous false and fraudulent records and statements with the FCC during their unjust enrichment periods, concealing that they transferred their licenses to USCC—all to avoid having to repay over $163 million to the Government. *See* JA29¶4.

### A.  Plaintiff O'Connor's Original *Qui Tam* Action Alleged a Fraud to *Obtain* Licenses at a Discount.

In 2005, defendants conspired to form and formed Carroll Wireless, L.P. to bid on and purchase licenses for USCC in Auction 58. JA32¶17.

19

Based on its fraudulent misrepresentations, Carroll obtained 16 licenses that were adjacent to or overlapped with USCC's wireless services areas, with $22.1 million in bid credits USCC otherwise would have had to pay to obtain the licenses itself. JA80¶151; JA85¶161.

In 2006, defendants engaged in another scheme to defraud using the same template, and conspired to form and formed Barat Wireless, L.P. to bid on and purchase licenses for USCC in Auction 66. JA32¶17. Based on its fraudulent misrepresentations, Barat obtained 17 licenses that were adjacent to or overlapped with USCC's wireless services areas with $42.4 million in bid credits for which it was not in fact eligible. JA95¶185. Again, USCC otherwise would have had to pay that additional amount to obtain the licenses for itself.[2]

In May 2007, plaintiff O'Connor and others filed an FCA complaint alleging that Carroll and Barat were fronts that USCC had used to acquire licenses with bid credits. *See Lampert & O'Connor, P.C. v. Carroll Wireless, L.P.*, No. 1:07-cv-800 (JDB) (D.D.C. May 2, 2007), ECF No. 1. Shortly after, the FCC announced the auction of 1099 licenses in FCC

---

[2]    Plaintiffs have since discovered that USCC formally acquired both Carroll and Barat in 2012, after their unjust enrichment periods, "for an immaterial amount." JA92¶177.

Auction 73. JA53¶75. Once again, defendants conspired to form and formed a sham designated entity—King Street Wireless, L.P.—to bid on and purchase licenses for USCC in FCC Auction 73. JA53¶¶76-77; JA64-65¶¶102-05; JA66-69¶¶108-14.

King Street won 152 licenses in Auction 73—all of which were adjacent to or overlapped with USCC's wireless services areas—with bids totaling just over $400 million, and then filed a long-form licensing application claiming eligibility for $100.2 million in bid credits from the Government as a "very small business." JA55-60¶¶84-91. King Street's application falsely certified, among other things, that no individual or entity, other than defendant Allison DiNardo, had a controlling interest in King Street, and that it had entered no partnerships "or other agreements, arrangements or understandings of any kind with third parties relating to the licenses being auctioned, including any such arrangements relating to the post-auction market structure." JA55¶84.

King Street later amended its licensing application, asserting that no revenues were being disclosed for USCC or its affiliates because "[n]one of these entities ha[d] control in the Applicant," or were "considered affiliates" with attributable gross revenues. JA57¶85. One

21

week later, plaintiff O'Connor filed an amended complaint (the 2008 Complaint), which added allegations that King Street was seeking to purchase licenses with bid credits as a front for USCC. *See Lampert & O'Connor*, No. 1:07-cv-800 (D.D.C. Apr. 24, 2008), ECF No. 11.

In January 2009, while King Street's licensing application was still pending, USCC and King Street entered a "Management Services Agreement," which delegated responsibility for the management, construction, and operation of the licenses to USCC. JA57¶87. Although it was required to report this agreement or amend its pending licensing application to include it, 47 C.F.R. § 1.65, King Street did neither. *See* JA57-58¶¶87-88.

Soon after, the district court partially unsealed the 2008 Complaint, and the FCC asked King Street to respond to plaintiff O'Connor's allegations. *See* JA58¶88. King Street denied that it was controlled by USCC, insisted that it was controlled by DiNardo, and, again, did not disclose the existence of the Management Services Agreement with USCC. *Ibid.* On December 27, 2009, the FCC granted the licenses to King Street based on its representations. JA58¶89. Because the FCC granted the licenses, plaintiff O'Connor voluntarily dismissed the 2008

22

Complaint without prejudice in January 2010. *See Lampert & O'Connor*, No. 1:07-cv-800 (D.D.C. Jan. 13 2008), ECF Nos. 29.

King Street disclosed the existence of its 2009 Master Services Agreement with USCC for the first time in its December 2010 Annual Report, one year into its unjust enrichment period, and one year after the 2008 Complaint was voluntarily dismissed. Even then, King Street did not provide a copy of the agreement itself. Instead, King Street misrepresented that it had "not entered into any agreements nor arrangements (including proposed agreements and arrangements)" related to its eligibility as a designated entity. *See* JA74¶131.

## B.    This *Qui Tam* Action Alleges a Scheme to Fraudulently *Retain* Hundreds of Millions of Dollars in Bid Credits.

After obtaining the spectrum licenses at a substantial discount, defendants engaged in further fraud to avoid having to repay the bid credits they used, even though their post-licensing actions automatically disqualified them from retaining the benefits.

### 1.    *USCC secretly assumed control of King Street's spectrum during the unjust enrichment period.*

In 2011, King Street secretly leased the full amount of its spectrum in 90 licenses to USCC (2011 King Street Lease)—an event that, under

23

the FCC's rules at the time, automatically disqualified King Street as a designated entity and thus would have required King Street to repay some or all of the bid credits it used in Auction 73. 47 C.F.R. § 1.2110(b)(3)(iv)(A). As an agreement that would affect King Street's eligibility as a designated entity, it was required to disclose this. Instead, King Street concealed the 2011 King Street Lease from the FCC to avoid having to repay the bid credits it used to buy the licenses. *See* JA62¶96.

Later that year, the FCC announced that it would award subsidies to companies that committed to providing wireless services in certain rural and under-served areas. To qualify for the subsidies, participants were required to certify that they had sufficient access to the spectrum in those areas to build the networks and provide service. JA76¶139. USCC wanted to apply, but to show that it qualified, it had to show that it had access to King Street's licensed spectrum in those areas—but King Street was still in the unjust enrichment period.

While USCC already had control of the King Street spectrum in those areas under the secret 2011 King Street Lease, USCC could not provide that agreement to the FCC without also disclosing that King Street had crossed the FCC's bright line barring designated entities from

24

leasing or reselling more than 25% of the spectrum in any single license area (as well as the FCC's *de facto* control rule). So instead, USCC submitted a summary of a *fake* agreement to the FCC (2012 Lease), which falsely represented that King Street had agreed to provide access *only* to the tiny census tracts covered in Auction 901. *See* JA77-78¶¶143-44. Because the census tracts were such a small part of each license area, the 2012 Lease would not raise concerns about King Street's continued eligibility as a designated entity. Indeed, the summary of the 2012 Lease did not even mention that King Street was a designated-entity licensee. And USCC's submission of the fictitious 2012 Lease was made in a different docket than the one containing King Street's disclosures. King Street itself never reported even the fake 2012 Lease to the FCC. JA78¶145.

In other words, USCC needed to show the FCC that it had access to the spectrum in Auction 901's specified census tract areas to qualify for the FCC subsidy, while King Street needed to conceal from the FCC that it had already ceded control of a disqualifying amount of its spectrum to USCC to retain the bid credits it received in Auction 73. The false and

25

fraudulent 2012 Lease, which helped to conceal the full extent of the actual spectrum transfer, accomplished both objects.

USCC won $40 million in subsidies in Auction 901 to build networks in 27 census tracts, 19 of which were in areas licensed to King Street. JA77¶141; JA78¶146.

### 2. *King Street submitted other false and fraudulent post-licensing disclosures during the unjust enrichment period.*

Besides concealing the spectrum transfer under the 2011 King Street Lease, King Street filed numerous false reports with the FCC to conceal its disqualifying relationship with USCC.

King Street expressly certified that the 2009 Master Services Agreement provided that King Street had "continuing oversight, review, supervision and control" of USCC's management of the buildout requirements; retained "authority and ultimate control over the determination and implementation of policy and business strategy;" was "responsible for the payment of all financial obligations and operating expenses;" that King Street "enjoy[ed] the profits and [bore] the risk of loss from the operation" of its systems; and would "determine the terms upon which" its "services [would be] offered, and prices charged."

JA74¶132. King Street repeated these false certifications in its 2011, 2012, and 2013 Annual Reports to the FCC. JA75¶133.

But plaintiffs independently determined that USCC constructed the networks and used the licenses to provide services to its own customers during the unjust enrichment period. JA75¶135. Plaintiffs also discovered that King Street never provided any wireless services or otherwise met the requirements for a wireless services provider, exposing the falsity in these certifications, too. *See* JA108¶108.

And between May 2012 and the end of 2019, King Street filed 152 Construction Notices with the FCC, falsely and fraudulently certifying that King Street had met its Final Buildout Requirements. King Street certified that it had constructed and was operating networks and serving the markets with a "signal level sufficient to provide adequate service to [70% or more] of the licensed-geographic area." JA72¶125.

Plaintiffs independently determined, though, that King Street never registered any antenna structures for the networks in any of its 152 licensed areas; that 40 sites listed in King Street's Construction Notices for its Cedar Rapids and Iowa City licenses actually matched antenna structures registered to USCC; and at two Cedar Rapids sites

27

where King Street claimed it had antennas, the permitted owner was a wholly-owned subsidiary of USCC. JA67¶¶110-11.

Accordingly, King Street also falsely and fraudulently claimed that it had complied with the Buildout Requirements in its Annual Reports. In 2011, King Street certified that it was "constructing LTE systems in numerous markets." JA73¶128. In 2012, King Street reported that it had "constructed LTE systems in several markets." JA73¶129. And in 2013, King Street repeated these falsehoods, reporting that it had satisfied "the interim construction requirements for all its one-hundred and fifty[-]two (152) markets, including constructing LTE systems in several of the markets." JA73¶130. As plaintiffs independently determined, King Street did none of this—it was all accomplished by USCC to serve its own customers.

King Street's unjust enrichment period ended on December 27, 2014. On February 9, 2018, USCC applied to the FCC for consent to formally transfer the King Street licenses from King Street/DiNardo to USCC. JA32¶16. Quite unusually, that application remains pending today. *See ibid.*

28

## III. PROCEDURAL HISTORY

Plaintiffs filed the original complaint in the Western District of Oklahoma in 2015. Plaintiffs amended the complaint twice, filing the operative Second Amended Complaint on June 2, 2020 (2020 Complaint), and the case was transferred to the District of Columbia in July of that year. JA23-114; Doc.127.

In October 2020, defendants moved to dismiss the 2020 Complaint on various grounds. The district court granted the motions on March 22, 2023, based solely on the public disclosure bar. JA936-49. The court found that plaintiff O'Connor's 2008 Complaint, which he had filed and dismissed without prejudice, barred him (and thus effectively anyone else) from filing a subsequent complaint that alleged further fraudulent conduct.[3]

The district court found that plaintiff O'Connor's 2008 Complaint barred his 2020 Complaint because it "alleged that Carroll, Barat, and King Street were fronts for [USCC] to fraudulently obtain the small

---

[3] Defendants argued that "other public filings in FCC proceedings independently impose the public disclosure bar," but the district court expressly declined to consider them, because it reasoned that "the 2008 FCA suit is alone sufficient to preclude this action." JA945 n.4.

29

business discount for the spectrum in Auctions 58, 66, and 73, respectively," and "[t]hose are the same core allegations—against the same defendants—that Plaintiffs-Relators' Complaint makes here." JA944.

While the court recognized that the new allegations of fraud in the 2020 Complaint involved "maintaining the sham front companies of Carroll, Barat, and King Street … while still certifying their [designated-entity] status so that they could retain their discount on the licenses they had obtained," the court held that these certifications merely "continued the same fraud that has already been disclosed" in the 2008 Complaint. JA945-46.

The district court then held that plaintiffs were not "an original source" of the fraud allegations in the 2020 Complaint. JA946. The court did not address the fact that plaintiff O'Connor is the *same relator* who brought the 2008 Complaint. Instead, the court held that the additional information of defendants' *post-licensing* fraudulent conduct alleged in the later complaint did not "materially add" to the publicly disclosed allegations in the unsealed 2008 Complaint. *Ibid.*

30

The court found that plaintiffs "rely chiefly on one nonpublic document," the secret 2011 King Street Lease, and concluded that "the spectrum-sharing and management relationship between [USCC] and King Street" was the same relationship disclosed in the fake 2012 Lease and an FCC Public Notice, which did not report the disqualifying transactions alleged by plaintiffs. JA946-47 (citing *In re Promoting Interoperability in the 700 Mhz Com. Spectrum*, 27 FCC Rcd. 3521, 3536 (Mar. 21, 2012)). While the court acknowledged that the 2011 King Street Lease was never disclosed to the Government, the court concluded "that alleged relationship between the entities at most supports the claim that Defendants continued the substantially similar, and already disclosed, original fraud." JA946-47.

Finally, the court found that plaintiffs' "independent 'investigation and research,'" exposing that USCC was using a disqualifying amount of King Street's spectrum and that King Street never functioned as the wireless services company it claimed to be, merely verified information in the public record that "[a]ny member of the public could have looked … up," and thus did not qualify plaintiffs as an original source of those allegations. JA948-49 (quotation marks omitted).

31

## STANDARD OF REVIEW

This case is still in the pleading stage, and the public disclosure bar is an affirmative defense on the merits. *See United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 738 n.1 (10th Cir. 2019) (collecting cases and noting that circuits "have unanimously held that the 2010 'amendments transformed the public disclosure bar from a jurisdictional bar to an affirmative defense'" (quoting *United States ex rel. Prather v. AT&T, Inc.*, 847 F.3d 1097, 1102 (9th Cir. 2017))). Accordingly, this Court should review the district court's decision dismissing the complaint *de novo* and affirm only if defendants have met their "burden of pleading and proving" some obvious bar to securing relief on the face of the complaint. *See*, *e.g.*, *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997) ("defendant bears the burden of pleading and proving" affirmative defenses). "If, from the allegations of the complaint as well as any judicially noticeable materials, an asserted defense raises disputed issues of fact, dismissal under Rule 12(b)(6) is improper." *ASARCO, LLC v. Union Pac. R. Co.*, 765 F.3d 999, 1004 (9th Cir. 2014).

## SUMMARY OF ARGUMENT

The district court's decision dismissing the case should be reversed.

**I.** Plaintiff O'Connor's 2008 Complaint does not bar the current *qui tam* action because he is an original source of the allegations of fraud that were publicly disclosed when that complaint was unsealed, and even if he weren't, that complaint does not allege "substantially *the same* allegations" as plaintiffs allege here.

**A.** The plain text of the "original source" exception, case law, and common sense all establish that plaintiff O'Connor was and always will be an original source of allegations *he* voluntarily disclosed to the Government before those allegations became public.

The first path to being an "original source" requires only that, "prior to a public disclosure," a relator "voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based." 31 U.S.C. § 3730(e)(4)(B). Plaintiff O'Connor voluntarily provided the Government with the allegations of fraud in his prior *qui tam* action before that case was unsealed. He is an original source of those publicly disclosed allegations of fraud.

The statute bars only "opportunistic plaintiffs who have no significant information to contribute of their own." *Springfield Terminal*, 14 F.3d at 649. As the source of both complaints, plaintiff O'Connor could

not have "opportunistically" relied on his own previous allegations, and he is an "original source" of them. *See, e.g., Gonzalez v. Planned Parenthood of Los Angeles*, 392 F. App'x 524, 527-28 (9th Cir. 2010); *United States ex rel. Shea v. Verizon Commc'ns, Inc.*, 160 F. Supp. 3d 16, 28 (D.D.C. 2015), *aff'd sub nom. United States ex rel. Shea v. Cellco P'ship*, 863 F.3d 923 (D.C. Cir. 2017).

This is the only reading that makes sense. No one disputes that the 2008 Complaint could have been amended to include the present allegations, and that in such posture, the public disclosure bar would not apply. To require a different result because plaintiff O'Connor voluntarily dismissed his 2008 Complaint without prejudice would introduce a barrier that is not in the text, exalt form over substance, and result in a waste of Government resources. *See, e.g.*, *United States ex rel. Fisher v. JPMorgan Chase Bank N.A.*, 413 F. Supp. 3d 569, 580-81 (E.D. Tex. 2019); *United States v. Educ. Mgmt. LLC*, 2014 WL 2766115, at *2 (W.D. Pa. June 18, 2014); *United States ex rel. Baker v. Cmty. Health Sys., Inc.*, 709 F. Supp. 2d 1084, 1100 (D.N.M. 2010), *opinion vacated in part on other grounds* 2014 WL 10212869 (D.N.M. Sept. 15, 2014).

34

**B.**  The other reason the 2008 Complaint is not a "public disclosure" of the allegations of fraud here is because the previous complaint alleged different frauds, and indeed could not have alleged the frauds here, because they did not arise until *after* the prior *qui tam* action was voluntarily dismissed. The previous allegations of fraud are thus not "substantially *the same* allegations," as required to bar the allegations in this case. 31 U.S.C. § 3730(e)(4)(A) (emphasis added).

The district court relied on pre-amendment case law to find that the allegations are "substantially *similar.*" JA944 (emphasis added). That is no longer the law. While the 1986 version of the statute barred allegations "based on" public disclosures, *United States ex rel. Settlemire v. District of Columbia*, 198 F.3d 913, 918-19 (D.C. Cir. 1999), the amended statute requires that the allegations be "substantially the same." *Contra* JA943 (believing that current public disclosure bar "requires a court to dismiss an action where a relator's claim is based on allegations and transactions made public by sources other than the relator before the complaint was filed"). Even under that old standard, publicly disclosed allegations of fraud do not bar *later* violations of *different* legal requirements, giving rise to *separate* FCA violations.

**II.** Even if the Court disagrees with all of that, plaintiffs are an "original source" of the allegations under the second path to that status, because their independent "knowledge" added "materially" to the allegations of fraud from the 2008 Complaint. 31 U.S.C. § 3730(e)(4)(B).

**A.** The "original source exception—which focuses on the 'materiality' of the new allegations—asks [courts] to consider how a relator's allegations might actually affect the government's decision-making." *United States ex rel. Maur v. Hage-Korban*, 981 F.3d 516, 525 (6th Cir. 2020) (cleaned up). Plaintiffs' independent knowledge materially added to the 2008 allegations, because after they disclosed the findings of their spectrum analysis to the Government, the DOJ actually conducted an inquiry that ultimately led USCC to hand over the secret 2011 King Street Lease—which confirmed plaintiffs' allegation that USCC controlled a disqualifying amount of King Street's spectrum during the unjust enrichment period.

That is independent knowledge that added "materially" to the original allegations from the 2008 Complaint, because it not only "might" have "affect[ed] the government's decision-making," *Maur*, 981 F.3d at 525, it prompted an investigation. Put differently, plaintiffs brought

36

"something to the table that … add[ed] value for the government." *See United States ex rel. Rahimi v. Rite Aid Corp.*, 3 F.4th 813, 831 (6th Cir. 2021) (quotation marks omitted).

That should meet the "materially adds" standard under any formulation of the test. Even if the district court's "substantially similar" determination did not conflict with the "substantially the same" requirement in the current version of the statute, plaintiff's independent knowledge showed that a "substantially similar scheme *ha[d] continued or restarted*." *Maur*, 981 F.3d at 525 (emphasis added) (holding this is sufficient to "materially add" to publicly disclosed allegations). As the Tenth Circuit would put it, plaintiffs' knowledge was "capable of influenc[ing] the behavior of the recipient—i.e., the government." *Reed*, 923 F.3d at 757 (quotation marks omitted).

**B.** In finding otherwise, the district court failed to accept plaintiffs' well-pleaded allegations as true, relying on several innocuous public documents to hold that plaintiffs' independent knowledge did not materially add to what was available in the public domain. The court believed that because the public could access the disparate, innocuous pieces of information plaintiffs sifted through as part of their effort to

37

discover the fraud—namely, the fake 2012 Lease, FCC public notices, local building permits, and the *lack* of filings King Street would have been required to file if it were operating as a legitimate wireless services provider, as it claimed to be in its filings with the FCC—plaintiffs could not be an original source of the allegations of post-licensing fraud asserted in this case.

Wrong. *First*, the district court failed to consider whether any of those documents in the public domain were disclosed in an enumerated channel, the required first step to determine whether the public disclosure bar is triggered. *Springfield Terminal*, 14 F.3d at 651. They were not. *See* 31 U.S.C. § 3730(e)(4)(A). *Second*, those documents did not disclose "substantially the same … transactions" as *either* the 2008 or 2020 Complaint, 31 U.S.C. § 3730(e)(4)(A), because they did not "reveal the essential elements of [the] fraudulent transaction[s]" plaintiffs allege, i.e., fraud, scienter, and materiality under the FCA, *Springfield Terminal*, 14 F.3d at 657. *Third*, when "scattered qualifying public disclosures each contain a piece of the puzzle, but none shows the full picture," and the relator's complaint "filled the gaps by putting together the material elements of the allegedly fraudulent scheme," the public

38

disclosure bar is not triggered. *Silbersher v. Valeant Pharms. Int'l, Inc.*, 76 F.4th 843, 857 (9th Cir. 2023); *see also Springfield Terminal*, 14 F.3d at 657 ("innocuous or spotty information—insufficient in itself to constitute an allegation of fraud or to reveal the essential elements of a fraudulent transaction," is insufficient even though it "exists in the public domain").

Congress intended that a relator "who uses their education, training, experience, or talent to uncover a fraudulent scheme from publicly available documents, should be allowed to file a *qui tam* action." 145 Cong. Rec. E1546-01, at *E1547. That is precisely what plaintiffs did here—uncovering a fraud that would have gone undetected by the Government absent their significant, independent efforts.

## ARGUMENT

Courts generally apply a two-part test to determine whether the public disclosure bar applies. The first step requires courts to determine whether "substantially the same allegations or transactions" have been publicly disclosed through an enumerated channel. *See United States v. Comstor Corp.*, 308 F. Supp. 3d 56, 70 (D.D.C. 2018) (citing *Springfield Terminal*, 14 F.3d at 651) (quotation marks omitted). "If—and only if—

39

the answer to the first question is affirmative," then courts "proceed to the original source inquiry." *Id.* at 651 (quoting *Springfield Terminal*, 14 F.3d at 651).

This is the unusual case, however, where the most direct path to reversal is to proceed directly to the original source inquiry rather than resolve any other issue, because it is so obviously clear that plaintiff O'Connor is an original source of the only public disclosure relied on by the district court to dismiss this case.

Even if that were not so, the 2020 Complaint alleges a post-licensing fraudulent scheme that is not "substantially the same" as the pre-licensing fraud alleged in the 2008 Complaint, which concerned different FCC regulations and violations of separate FCA prohibitions. None of the other public documents were public disclosures of the frauds alleged here either.

I.    **THE 2008 COMPLAINT DOES NOT BAR THE CURRENT 2020 COMPLAINT.**

A.    **Plaintiff O'Connor is an Original Source of the Fraud Allegations in the 2008 Complaint.**

The district court dismissed the case solely on the ground that the 2008 Complaint publicly disclosed the allegations here—without

40

considering that plaintiff O'Connor was an original source of the allegations of fraud in the 2008 Complaint, and so, always will be. That is enough to reverse the court's decision in its entirety.

The first original source exception requires that, "prior to a public disclosure under subsection (e)(4)([A])," the plaintiff have "voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based." 31 U.S.C. § 3730(e)(4)(B). Plaintiff O'Connor's 2008 Complaint was served on counsel for the Government on April 25, 2008, *Lampert & O'Connor*, No. 1:07-cv-800 (D.D.C. Apr. 24, 2008), ECF No. 11, at 25, and was not publicly disclosed until it was unsealed on October 20, 2009, *id.* (D.D.C. Oct. 20, 2009) (docket entry unsealing case). Plaintiff O'Connor thus qualifies as an original source, because even under the district court's view that the allegations in the two complaints are "substantially similar," JA944, "prior to [the] public disclosure" of the 2008 Complaint, he "voluntarily disclosed" its allegations to the Government. 31 U.S.C. § 3730(e)(4).

He did not lose original source status when he voluntarily dismissed his prior case. The statute contains no such barrier. The district court's decision thus contravenes the text of the statute, case law,

41

and common sense. *See United States ex rel. Minnesota Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1051 (8th Cir. 2002) (relators were an original source of the fraud allegations in their own prior, publicly disclosed antitrust complaint).

Instead, the statute bars claims by "opportunistic plaintiffs who have no significant information to contribute of their own." *Springfield Terminal*, 14 F.3d at 649. As "the source of both" complaints, plaintiff O'Connor "could not possibly have 'opportunistically' relied on the unsealing of" his own allegations. *See, e.g., Shea*, 160 F. Supp. 3d at 28 ("The allegations in the 2007 Complaint came from Shea himself. He could not possibly have 'opportunistically' relied on the unsealing of the 2007 Complaint in order to add claims to Verizon II—Shea is the source of both."). In fact, the district court acknowledged that the partial unsealing of his allegations is what "actually did" prompt the FCC to call for a response from King Street before ultimately granting it licenses in Auction 73. *See* JA944.

In *Gonzalez v. Planned Parenthood of Los Angeles*, the district court held, like the district court here, that a relator's separate, prior lawsuit was a public disclosure of "the same allegations giving rise to" his later

*qui tam* action against the same defendant. 392 F. App'x at 527. "The district court concluded, however, that" the relator "was not an 'original source' of the information disclosed, and that [his] state court lawsuit for that reason served to bar the *qui tam* suit."[4] *Ibid.* The Ninth Circuit disagreed. This Court should do the same.

The Ninth Circuit acknowledged that the prior lawsuit was "indeed an enumerated source of a public disclosure under the statute." 392 F. App'x at 527. But the court of appeals recognized that the relator "acquired his knowledge before the allegedly fraudulent" scheme was "'disclosed' to the public within the meaning of the FCA, and he was later the driving force behind the disclosure made in his [previous] lawsuit." *Id.* at 528. Because the relator "acquired the information before" he filed his original lawsuit, the Ninth Circuit held that he "therefore qualifie[d] as an 'original source' of the allegations in the [prior] complaint, and the public disclosures in that complaint" could not bar his later *qui tam* action. *Ibid.*

---

[4]    Under the post-2010 version of the public disclosure bar that applies here, a state court filing would not qualify as a public disclosure at all. *See* 31 U.S.C. § 3730(3)(4)(A)(i) (only "*Federal* criminal, civil, or administrative hearing in which the Government or its agent is a party" counts as channel (i) disclosure (emphasis added)).

Congress "chose to reward persons who discovered and revealed the fraud," requiring only that they "revealed it to the government before filing suit." *Minnesota Ass'n of Nurse Anesthetists*, 276 F.3d at 1051. Plaintiffs' 2020 Complaint should not be treated differently under the public disclosure bar than if they had amended the 2008 Complaint instead. Nothing in the text requires that result. Cases also reject it. *See, e.g.*, *Fisher*, 413 F. Supp. 3d at 580-81 (rejecting the argument that original source status should turn on whether the relator amended the complaint or "filed a separate lawsuit"); *see also Educ. Mgmt. LLC*, 2014 WL 2766115, at *2 (finding public disclosure bar does not bar amended complaint "that was basically a continuation of the original complaint"); *Baker*, 709 F. Supp. 2d at 1100 (allowing previous complaint to bar amended complaint would "not comport with the objective behind § 3730(e)(4), which is to prevent filings by opportunistic late-comers to a lawsuit").

And for good reason. Exalting such form over substance would prevent relators from pursuing actionable frauds they originally uncovered, in a manner entirely unmoored from the text of the statute. This would also waste Government resources and result in stolen

44

Government funds going unrecovered, because when relators like plaintiff O'Connor voluntarily dismiss their *qui tam* actions, other would-be relators would likewise be barred from bringing suit, and the Government would have to pursue all such frauds itself. But Congress determined that in the face of a "severe" problem of fraud on the Government, "a coordinated effort of both the Government and the citizenry" was necessary. S. Rep. No. 99-345, at 2. It thus sought to bar only truly "parasitic lawsuits." *See Kirk*, 563 U.S. at 413 (quotation marks omitted). This is not one.

## B. The Allegations in the 2008 Complaint Did Not Disclose the Allegations in the 2020 Complaint.

The public disclosure bar does not apply to all information in the public domain. The other requirement for the 2008 Complaint to count as a "public disclosure" of the allegations here is that it had to contain "substantially the same allegations" as alleged in this case. 31 U.S.C. § 3730(e)(4)(A). It does not.

The 2008 Complaint alleged that defendants engaged in a fraudulent scheme to use sham "very small businesses" to *obtain* licenses for USCC with bid credits for which it was not itself eligible. The 2020 Complaint brings different claims of fraud—implicating different FCC

45

requirements and provisions of the FCA—which *could not* be based on the allegations in the original action.

A simple counterfactual shows why. Suppose that instead of fraudulently obtaining discounted licenses at the outset, King Street had been operating as a small, legitimate wireless services company for years. And suppose that after acquiring discounted licenses as a designated entity in Auction 73, entitled to 25% in bid credits, King Street then immediately leased the entirety of those licenses to a company like USCC during the unjust enrichment period. But because King Street knows this transaction would require it to pay back the bid credits it used to acquire those licenses, King Street decides not to inform the FCC, and files Annual Reports falsely certifying that it remains in control of its spectrum licenses from Auction 73. No one disputes that this would constitute actionable fraud, even though the licenses were legitimately obtained at the outset.

It makes no difference that, in fact, King Street engaged in a different fraud from the beginning to illegitimately obtain the licenses using bid credits. If anything, the FCC's decision to grant King Street the licenses after King Street responded to plaintiff O'Connor's unsealed

46

allegations in his original *qui tam* action effectively diminished the value of the 2008 Complaint as a source of the allegations for the post-licensing frauds alleged here. Plaintiffs' allegations of defendants' post-licensing frauds are not "substantially the same allegations" as those regarding defendants' pre-licensing conduct.

The district court provided minimal analysis. But even what it did say was wrong. In less than two pages, the district court concluded that the "allegations of continued fraud are substantially *similar*" to those in the 2008 Complaint, relying on cases analyzing the 1986 version of the public disclosure bar. JA945 (emphasis added) (citing *Settlemire*, 198 F.3d at 919). Applying that pre-amendment case law, the court reasoned that plaintiffs merely alleged that defendants "continued to perpetrate the fraud to retain their discounts," and simply "provide[d] more specific instances of the general fraudulent practice that they allegedly initiated to obtain those discounts in the first place." JA945-46.

Even if true (it is not), the court failed to acknowledge that, as amended, the post-2010 version of the public disclosure bar does not apply simply because allegations are *similar*; for the version of the statute that applies here to bar plaintiffs' claims, the 2020 Complaint had

47

to allege "substantially *the same*" allegations as those in the 2008 Complaint. *See* 31 U.S.C. § 3730(e)(4)(A) (emphasis added). When Congress amended the statute, it replaced the 1986 text—barring *qui tam* claims asserting allegations "based upon" publicly disclosed allegations or transactions—and now bars only publicly disclosed allegations or transactions that are "substantially the same" as those alleged in the complaint.

The 2020 Complaint alleges that after receiving the licenses, King Street transferred a disqualifying amount of its spectrum to USCC, disqualifying King Street as an eligible designated entity and requiring the repayment of the bid credits to the Government. JA60-63¶¶92-99. It was defendants' conduct in keeping that transfer secret that defrauded the Government during the unjust enrichment period. *See* JA70-73¶¶118-30. The 2020 Complaint thus alleges a different fraudulent scheme to retain and avoid having to repay $100.2 million to the Government, implicating separate FCC regulations and a different violation of the FCA. *See* 31 U.S.C. § 3729(a)(1)(G) (FCA provision that covers, here, the alleged fraud to avoid having to repay benefits defendants were not entitled to keep). Far from merely providing more

48

specific details about what happened to obtain the licenses at a discount, the 2020 Complaint's allegations of additional fraudulent conduct occurred after the earlier *qui tam* action had been voluntarily dismissed.

As noted, the district court relied on this Court's analysis of the 1986 version of the public disclosure bar in *Settlemire* to dismiss the case. JA945 (citing 198 F.3d at 919). But in *Settlemire*, "publicly disclosed information show[ed] how th[e] same defendant intended to spend monies appropriated under th[e] same statute" as alleged in the follow-on case. *Ibid. But see Maur*, 981 F.3d at 525 ("allegations that a substantially similar scheme *has continued or restarted* could provide the government with 'knowledge that is independent of and materially adds' to the public disclosures" such that relator qualifies as an original source (emphasis added)).

Even then, this Court did not foreclose the possibility that under the 1986 version of the statute: "Cases may arise where disclosures of a practice are insufficient to be considered public disclosures of later instances" of the same practice. *See Settlemire*, 198 F.3d at 919. Under that precedent, too, it makes little sense to bar *ab initio* allegations about a scheme that could not yet have been accomplished because the licenses

49

had not yet been granted. When, as here, publicly disclosed information does not disclose *later* violations of *different* legal requirements, it should not bar later FCA claims alleging those violations.

## II. PLAINTIFFS ARE ORIGINAL SOURCES OF THE ALLEGATIONS IN THE 2020 COMPLAINT.

Suppose this Court thinks that everything above is wrong. That plaintiff O'Connor is not an original source of the allegations he disclosed to the Government before they became public in 2009. And that those allegations of pre-licensing fraud to obtain discounted licenses are indeed "substantially the same" as the allegations of post-licensing fraud to avoid having to pay back those discounts. Plaintiffs still qualify as an original source, because under the second path to establish "original source" status, their independent knowledge "materially adds" to the allegations from the 2008 Complaint.

Under the second path, an "'original source' means an individual who … has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section." 31 U.S.C. § 3730(e)(4)(B). Plaintiffs allege that they provided their allegations of post-licensing fraud to the Government

50

before filing the 2020 Complaint. JA39¶37. So the only question is whether those allegations are based in "knowledge" that is "independent of" and "materially adds to" the allegations of pre-licensing fraud from the 2008 Complaint.

### A. Plaintiffs' Independent Knowledge "Materially Adds" to the Allegations in the 2008 Complaint.

The most important requirement is that a relator's knowledge "materially add" to the publicly disclosed allegations or transactions. This is true whether a relator is asserting non-public facts, or instead relying on expertise. This is the most important requirement because when the relator's contributions to the understanding of the fraud are immaterial, the relator's action is properly characterized as "parasitic"; such a relator has done nothing significant to bring fraud to light—and therefore is not entitled to the rewards reserved for relators who do. On the other hand, when the relator's knowledge materially contributes to the detection and redress of fraud on the Government, the action is not parasitic, and the relator thus fulfills the purpose of the FCA and the original source exception.

Thus, the "original source exception—which focuses on the 'materiality' of the new allegations—asks [courts] to consider how a

51

relator's allegations might actually affect the government's decision-making." *See Maur*, 981 F.3d at 525 (cleaned up). "The question whether a relator's information 'materially adds' to disclosures will often overlap with whether the relator's allegations are substantially the same as those prior revelations," but "the 'materially adds' inquiry must remain conceptually distinct; otherwise, the original source exception would be rendered nugatory." *Ibid.* (quoting *United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 211-12 (1st Cir. 2016)) (cleaned up). Thus, even "allegations that a substantially similar scheme *has continued or restarted* could provide the government with 'knowledge that is independent of and materially adds' to the public disclosures." *Ibid.* (emphasis added).

Here, plaintiffs' knowledge "materially adds" to the publicly disclosed transactions by revealing an otherwise-hidden fraud. And their "knowledge" was "[i]ndependent" because it was "not derived from the public disclosure." *United States ex rel. Ambrosecchia v. Paddock Lab'ys, LLC*, 855 F.3d 949, 955 (8th Cir. 2017) (quotation marks omitted). While this Court has not yet interpreted the "materially adds" requirement in the context of the amended statute, other courts have recognized that, in

52

this setting, it requires the relator to "bring something to the table that would add value for the government." *Rahimi*, 3 F.4th at 831 (quotation marks omitted); *see also Reed*, 923 F.3d at 757 (holding that "new information that is sufficiently significant or important that it would be capable of' 'influenc[ing] the behavior of the recipient'—i.e., the government—ordinarily will satisfy the materially-adds standard"); *Moore & Co.*, 812 F.3d at 306 ("[T]o 'materially add[]' to the publicly disclosed allegation or transaction of fraud relator must contribute significant additional information to that which has been publicly disclosed so as to improve its quality.").

Plaintiffs' engineering spectrum analysis prompted the Government to investigate the allegations and, eventually, to uncover the secret 2011 King Street Lease. There is little question under any interpretation of the "materially adds" standard that plaintiffs' knowledge meets that requirement vis-à-vis the original allegations of fraud from the 2008 Complaint, which predated the unlawfully concealed spectrum transfer.

In February 2015, before filing their first complaint, plaintiffs commissioned independent field tests of wireless spectrum that showed

that USCC had incorporated King Street spectrum in two Iowa markets entirely into its own network. This was shown because the tests revealed a continuous radio signal across the King Street-licensed spectrum and the adjacent USCC-licensed spectrum. If King Street had instead been operating its wireless network independently, the tests would have shown a significant drop in signal power between the two licensed bands. JA62-63¶¶98-99.

That revelation from the spectrum analysis led them to discover the summary of the fake 2012 Lease that USCC submitted to the FCC in Auction 901. *See* JA78¶145. From there, they determined that King Street never separately met its obligation to disclose even the fake 2012 Lease to the FCC, as required by the agency's regulations. *See supra* pp.23-26. After plaintiffs reported this to the Government, the DOJ then investigated the allegations, and USCC eventually turned over the real 2011 King Street Lease to the Government. That document had never previously been disclosed by *either* USCC or King Street. Plaintiffs' independent knowledge materially added to the publicly disclosed transactions, which expressly provided that only a *non-disqualifying* amount of spectrum had been shared. If the real 2011 King Street Lease

54

and fictitious 2012 Lease were materially the same, as the district court believed, *see* JA947-48, the Government would never have conducted its inquiry to begin with. *See Reed*, 923 F.3d at 757 ("materially-adds standard" met where new information is "capable of influencing the behavior of the … government" (cleaned up)).

The district court entirely failed to consider this evidence in light of the FCC's attributable material relationship rule. 47 C.F.R. § 1.2110(c)(2)(ii)(H); *see* JA947-48. Although the court understood that "[t]he main difference between the 2011 and 2012 [agreements] appears to be their geographic scope; the 2012 [agreement] allegedly covered much less territory," JA947, it overlooked the effect of that difference in geographic scope under the rule, whose bright-line test depends entirely on the geographic extent of the lease, *supra* pp.23-26. The district court's opinion only refers to the *de facto* control test, failing even to mention the alleged violation of the attributable material relationship rule. JA948 (believing the only "operative fact" to be "whether [USCC] was exercising secret, *de facto* control over King Street").

That isn't all. Plaintiffs also discovered through their private investigations that USCC was using King Street's licenses to provide

55

USCC-branded service to its own customers; that retail service contracts offered to customers for services using King Street's spectrum were with USCC, not King Street; and that USCC, not King Street, set the rates, terms, and conditions for the wireless services using the King Street spectrum. JA101¶101; JA65¶105. Plaintiffs further uncovered that King Street never offered its own wireless services; never owned or operated any retail stores; had no customers, billing system, or any core network capabilities; and never marketed wireless services in any of its licensed areas. JA66¶108. Finally, plaintiffs found that King Street never applied for any telephone numbers from the North American Numbering Plan, which meant that it could not have offered any bundled voice and data services, and never reported that it had deployed any mobile wireless service, which it would have had to do if it had been providing services. JA68¶¶112-13; *see* 47 C.F.R. § 1.7001(b).

All this independent knowledge "materially adds" to the allegations in the 2008 Complaint, because it "contribute[s] significant additional information to that which has been publicly disclosed so as to improve its quality." *Moore & Co.*, 812 F.3d at 306. This evidence contradicted and

exposed the falsities in King Street's numerous express certifications to the FCC.

This conclusion is supported by the Ninth Circuit's decision in *Silbersher*, which held that by filling "the gaps by putting together the material elements of the allegedly fraudulent scheme," the allegations in plaintiff's complaint allowed the "full picture" of defendants' fraud to emerge, where it was previously hidden in large part and otherwise "scattered" in various sources, each of which only contained "a piece of the puzzle." 76 F.4th at 857. Plaintiffs' spectrum analysis and expertise in telecommunications law generally, and FCC regulatory processes specifically, first revealed that King Street had transferred a disqualifying amount of its spectrum to USCC then hid the transfer from the Government, "a critical fact necessary for scienter." *See ibid.* (same as to patent prosecutions).

### B.    The Information in the Public Domain Did Not Disclose the Frauds Alleged in the 2020 Complaint.

The district court found, however, that plaintiffs' information was not "independent of" and did not "materially add" to the information that was already in the public domain. The district court did not doubt that plaintiffs have specialized knowledge of telecommunications law. Nor did

57

the district court dispute their independent evidence as "knowledge" that is "independent of" the allegations in King Street's and USCC's filings. The district court did not seriously grapple with the "materially adds" prong of the inquiry, arguing instead that plaintiffs' knowledge and independent evidence merely confirmed publicly available information— namely, the summary of the 2012 Lease, FCC public notices, local building permits, and the absence of required filings by King Street as having publicly disclosed the frauds alleged.

This was incorrect thrice over. *First*, none of the documents cited by the court qualified as a public disclosure under the statute. As described more fully in the related appeal, the court was required to determine, at step one of the public disclosure bar analysis, whether any of these documents were disclosed in one of the three post-2010 enumerated channels: "(i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or (iii) from the news media." 31 U.S.C. § 3730(e)(4); *see* Opening Br. 44-52, No. 23-7041 (related appeal brief explaining why such documents are not "public disclosures"); *see also*

58

*Springfield Terminal*, 14 F.3d at 651 ("First, the reviewing court must ascertain whether the allegations or transactions … were publicly disclosed" in an enumerated channel (cleaned up)). The court did not make that determination, and those publicly available documents do not fall in any of those narrow channels. *See Silbersher*, 76 F.4th at 853 (first channel "primarily involves adversarial proceedings that are adjudicated on the merits before a neutral tribunal or decisionmaker," while the second "primarily involves federal investigatory proceedings").

Most of the public records the district court identified are FCC filings that are stored in databases accessible through the FCC's website, *e.g.,* a summary of the 2012 Lease; the FCC Public Rulemaking Notice; and King Street's Annual Reports. That they contain information in the possession of the Government does not make them a "public disclosure" under the statute. *See*, *e.g.*, *United States ex rel. Oliver v. Philip Morris USA Inc.*, 763 F.3d 36, 42 (D.C. Cir. 2014) (federal government's awareness of a fact does not make it a public disclosure); *see also United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 123-24 (2d Cir. 2021) ("[N]ine courts of appeals have held that the [public disclosure] bar applies only where there has been a disclosure *outside* of the

59

government." (quotation marks omitted)) (collecting cases). And the local building permits, which were also cited by the court, were not filed with the FCC, nor disclosed in any *Federal* hearing or *Federal* report. *Compare* 31 U.S.C. § 3730(e)(4).

The court also cited the *absence* of certain required FCC filings, which plaintiffs relied on to support their allegations that King Street was not actually operating as a legitimate wireless communications company, on the ground that those "forms are all public, and [a]ny member of the public could have looked them up." JA949 (quotation marks omitted). In other words, the court believed the general public could easily have discovered that King Street was not operating as a legitimate wireless services provider by searching for and finding no application for telephone numbers from the North American Numbering Plan and no report that it had deployed any mobile wireless service. But the absence of a public filing is obviously not a "public disclosure." And the court ignored that Congress wanted a relator "who uses their education, training, experience, or talent to uncover a fraudulent scheme from publicly available documents" to "be allowed to file a *qui tam* action."145 Cong. Rec. E1546-01, at *E1547.

*Second*, in any event, those publicly available documents did not disclose "substantially the same allegations or transactions" as *either* the 2008 or 2020 Complaint. 31 U.S.C. § 3730(e)(4). No one argues that these documents disclose "substantially the same allegations" of fraud. The question, then, is whether they disclose the fraudulent "transactions," as opposed to "mere information" (which would not trigger the bar). *A-1 Ambulance Serv., Inc. v. California*, 202 F.3d 1238, 1243 (9th Cir. 2000) (citation omitted).

In conducting this inquiry, courts are mindful that "[e]mbracing too broad a definition of 'transaction'" would "threaten[] to choke off the efforts of *qui tam* relators in their capacity as 'private attorneys general,'" in conflict with the "recognized purpose of the" FCA. *United States ex rel. Rabushka v. Crane Co.*, 40 F.3d 1509, 1514 (8th Cir. 1994) (quoting *United States ex rel. Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 566 (11th Cir. 1994)). Consequently, courts hold that a "transaction" is disclosed only if all "the essential elements comprising that fraudulent transaction have been publicly disclosed so as to raise a reasonable inference of fraud." *Ibid.*; *see also United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 918-19 (6th Cir. 2017) (same);

61

*United States ex rel. Feingold v. AdminaStar Fed., Inc.*, 324 F.3d 492, 495 (7th Cir. 2003) (same). As this Court explained, "the courthouse doors do not swing shut merely because innocuous information necessary though not sufficient to plaintiff's suit has already been made public." *Springfield Terminal*, 14 F.3d at 657.

Thus, the disclosed transactions must be specific to the fraud alleged in the complaint. In *Springfield Terminal*, this Court held that "innocuous or spotty information—insufficient in itself … to reveal the essential elements of a fraudulent transaction," is insufficient just because it "exists in the public domain." 14 F.3d at 657. That is why, rather than conducting the inquiry "at too high a level of generality," courts must "take a careful look at the details of each alleged fraud." *Sturgeon v. Pharmerica Corp.*, 438 F. Supp. 3d 246, 264 & n.115 (E.D. Pa. 2020) (collecting cases).

As described previously, the summary of the fictitious 2012 Lease did not disclose plaintiffs' allegations that King Street transferred a disqualifying amount of its spectrum to USCC in 2011—it was created to *hide* that transaction. *Supra* pp.23-26. And the FCC statement in a Public Rulemaking Notice, based on a press release, that USCC had

"recently announced the planned launch of an LTE network that will cover 25 percent of its customers and will use the 700 MHz licenses of its partner, King Street Wireless," 27 FCC Rcd. at 3534, did not disclose a *disqualifying* transfer or relationship either.

*Third*, knowledge gleaned from information in the public domain still counts as "independent" "knowledge." This is especially so when a relator analyzes information that does not, on its face, reveal the fraud. For example, in *United States ex rel. Osheroff v. Tenet Healthcare Corp.*, 2012 WL 2871264, at *3 (S.D. Fla. July 12, 2012), the court held that the public disclosure bar did not apply when the complaint was based on the "[r]elator's synthesis and analysis of otherwise apparently innocuous, garden-variety real estate/financial information." Although that case was about whether (under the pre-amended statute) a public disclosure occurred at all, the court commented that in light of the relator's "independent synthesis and analysis of Defendant's seemingly innocuous financial materials, it is highly probable that Plaintiff would also satisfy the 'original source' analysis." *Id*. at *4 n.7.

The Seventh Circuit has similarly acknowledged even under the pre-amended statute that "a plaintiff might be an original source even

though her knowledge of every isolated element of the fraud is based upon public disclosures"; specifically, "[i]n an exceptionally or unusually complicated allegation of fraud each piece of the information may be publicly disclosed, yet the fraud itself may remain hidden until some perspicacious plaintiff puts it in perspective." *United States v. Bank of Farmington*, 166 F.3d 853, 864 (7th Cir. 1999), *overruled on other grounds by Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 914-15 (7th Cir. 2009).

The public disclosure bar's architects forcefully made the same argument before implementing the 2010 amendments. The architect of the public disclosure bar in 1986 and also of the 2010 amendments expressed "dismay … with the courts' crabbed interpretations" of the 1986 statute. 145 Cong. Rec. E1546-01, at *E1546. In particular, Representative Howard Berman "forcefully … disagree[d] with cases holding that *qui tam* suits are barred if the relator obtains some, or even all, of the information necessary to prove fraud from publicly available documents." *Ibid*. Instead, he believed that relators who use "their education, training, experience, or talent to uncover a fraudulent scheme

from publicly available documents, should be allowed to file a *qui tam* action." *Ibid*.

*     *     *

Plaintiffs analyzed hundreds of pages of filings and agreements, conducted field tests of electromagnetic spectrum usage, conducted private investigations and surveillance, and applied their legal and industry knowledge to those disparate data points to reveal the scheme to defraud the Government. It was *their* research and investigation that disclosed the fraudulent transfer and scheme to defraud—not any information in the public domain.

Furthermore, plaintiffs' knowledge not only "materially adds" to the publicly disclosed transactions at the pleading stage but will continue to do so. Plaintiffs are qualified not only to bring this case but also to carry it forward because they can anticipate, understand, and help refute the arguments defendants will inevitably make to justify their conduct. That is critical because the FCA contemplates not only that relators will bring cases to the Government's attention, but also litigate those cases when the Government is unable or unwilling. *See, e.g.*, S. Rep. No. 99-

65

345, at 23-24; 145 Cong. Rec. E1546-01, at *E1546. For this case, plaintiffs are the ideal plaintiffs, and a paradigmatic original source.

## CONCLUSION

The district court's decision should be reversed.

Dated: February 2, 2024                  Respectfully submitted,

 

                                     /s/ Daniel Woofter

Sara M. Lord                             Daniel Woofter
James R. Wiseman                         GOLDSTEIN, RUSSELL &
ARNALL GOLDEN GREGORY,                       WOOFTER, LLC
   LLP                               1701 Pennsylvania Ave. NW
2100 Pennsylvania Ave. NW                Suite 200
Suite 350S                               Washington, DC 20006
Washington, DC 20006                     (202) 240-8433
(202) 677-4054                           dhwoofter@goldsteinrussell.com
sara.lord@agg.com
james.wiseman@agg.com                    *Attorneys for Plaintiffs-*
                                         *Appellants Mark J. O'Connor*
Benjamin J. Vernia                       *and Sara F. Leibman*
THE VERNIA LAW FIRM
1455 Pennsylvania Ave. NW
Suite 400
Washington, DC 20004
(202) 349-4053
bvernia@vernialaw.com

**ADDENDUM**

# ADDENDUM TABLE OF CONTENTS

31 U.S.C. § 3729...................................................................... A2

31 U.S.C. § 3730(b) ................................................................ A6

31 U.S.C. § 3730(e)(4)............................................................ A8

31 U.S.C. § 3730(e)(4) (1986)................................................. A8

47 C.F.R. § 1.2110................................................................. A10

---

## 31 U.S.C. § 3729, False Claims

(a) Liability for certain acts.

(1) In general. Subject to paragraph (2), any person who

    (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

    (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

    (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

    (D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

    (E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

    (F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the

Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-4101), plus 3 times the amount of damages which the Government sustains because of the act of that person.

(2) Reduced damages. If the court finds that

(A) the person committing the violation of this subsection furnished officials of the United States responsible for investigating false claims violations with all information known to such person about the violation within 30 days after the date on which the defendant first obtained the information;

(B) such person fully cooperated with any Government investigation of such violation; and

(C) at the time such person furnished the United States with the information about the violation, no criminal prosecution, civil action, or administrative action had commenced under this title with respect to such violation, and the person did not have actual knowledge of the existence of an investigation into such violation,

the court may assess not less than 2 times the amount of damages which the Government sustains because of the act of that person.

(3) Costs of civil actions.

A3

A person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages.

(b) Definitions. For purposes of this section

(1) the terms "knowing" and "knowingly"

    (A) mean that a person, with respect to information

        (i) has actual knowledge of the information;

        (ii) acts in deliberate ignorance of the truth or falsity of the information; or

        (iii) acts in reckless disregard of the truth or falsity of the information; and

    (B) require no proof of specific intent to defraud;

(2) the term "claim"

    (A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that

        (i) is presented to an officer, employee, or agent of the United States; or

        (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government

            (I) provides or has provided any portion of the money or property requested or demanded; or

A4

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;

(3) the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

(4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

(c) Exemption from disclosure.

Any information furnished pursuant to subsection (a)(2) shall be exempt from disclosure under section 552 of title 5.

(d) Exclusion.

This section does not apply to claims, records, or statements made under the Internal Revenue Code of 1986.

**31 U.S.C. § 3730(b)**

(b) Actions by private persons.

(1) A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government. The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting.

(2) A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the Government pursuant to Rule 4(d)(4) of the Federal Rules of Civil Procedure.1 The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information.

(3) The Government may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal under paragraph (2). Any such motions may be supported by affidavits or other submissions in camera. The defendant shall not be required to respond to any complaint filed under this section until 20 days after the complaint is unsealed and served upon the defendant pursuant to Rule 4 of the Federal Rules of Civil Procedure.

(4) Before the expiration of the 60-day period or any extensions obtained under paragraph (3), the Government shall—

(A) proceed with the action, in which case the action shall be conducted by the Government; or

(B) notify the court that it declines to take over the action, in which case the person bringing the action shall have the right to conduct the action.

(5) When a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action.

**31 U.S.C. § 3730(e)(4)**

(A) The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—

> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
>
> (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
>
> (iii) from the news media,

unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

---

**The version of 31 U.S.C. § 3730(e)(4), as amended in 1986, read:**

(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the

A8

information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

**47 C.F.R. § 1.2110, Designated entities**

(a) Designated entities are small businesses, businesses owned by members of minority groups and/or women, and rural telephone companies.

(b) Eligibility for small business and entrepreneur provisions—

(1) Size attribution.

(i) The gross revenues of the applicant (or licensee), its affiliates, its controlling interests, the affiliates of its controlling interests, and the entities with which it has an attributable material relationship shall be attributed to the applicant (or licensee) and considered on a cumulative basis and aggregated for purposes of determining whether the applicant (or licensee) is eligible for status as a small business, very small business, or entrepreneur, as those terms are defined in the service-specific rules. An applicant seeking status as a small business, very small business, or entrepreneur, as those terms are defined in the service-specific rules, must disclose on its short- and long-form applications, separately and in the aggregate, the gross revenues for each of the previous three years of the applicant (or licensee), its affiliates, its controlling interests, the affiliates of its controlling interests, and the entities with which it has an attributable material relationship.

(ii) If applicable, pursuant to § 24.709 of this chapter, the total assets of the applicant (or licensee), its affiliates, its controlling interests, the affiliates of its controlling interests, and the entities with which it has an attributable material relationship shall be attributed to the applicant (or licensee) and considered on a cumulative basis and aggregated for purposes of determining whether the applicant (or licensee) is eligible for status as an entrepreneur. An applicant seeking status as an entrepreneur must disclose on its short- and long-form applications, separately and in the aggregate,

A10

the gross revenues for each of the previous two years of the applicant (or licensee), its affiliates, its controlling interests, the affiliates of its controlling interests, and the entities with which it has an attributable material relationship.

(2) Aggregation of affiliate interests. Persons or entities that hold interests in an applicant (or licensee) that are affiliates of each other or have an identity of interests identified in § 1.2110(c)(5)(iii) will be treated as though they were one person or entity and their ownership interests aggregated for purposes of determining an applicant's (or licensee's) compliance with the requirements of this section.

Example 1 to paragraph (b)(2): ABC Corp. is owned by individuals, A, B and C, each having an equal one-third voting interest in ABC Corp. A and B together, with two-thirds of the stock have the power to control ABC Corp. and have an identity of interest. If A & B invest in DE Corp., a broadband PCS applicant for block C, A and B's separate interests in DE Corp. must be aggregated because A and B are to be treated as one person or entity.

Example 2 to paragraph (b)(2): ABC Corp. has subsidiary BC Corp., of which it holds a controlling 51 percent of the stock. If ABC Corp. and BC Corp., both invest in DE Corp., their separate interests in DE Corp. must be aggregated because ABC Corp. and BC Corp. are affiliates of each other.

(3) Exceptions—

* * *

(iv) Applicants or licensees with material relationships—

* * *

(B) Attributable material relationships. An applicant or licensee must attribute the gross revenues (and, if applicable, the total assets) of any entity, (including

A11

the controlling interests, affiliates, and affiliates of the controlling interests of that entity) with which the applicant or licensee has an attributable material relationship. An applicant or licensee has an attributable material relationship when it has one or more arrangements with any individual entity for the lease or resale (including under a wholesale agreement) of, on a cumulative basis, more than 25 percent of the spectrum capacity of any one of the applicant's or licensee's licenses.

* * *

(c) Definitions—

(1) Small businesses. The Commission will establish the definition of a small business on a service-specific basis, taking into consideration the characteristics and capital requirements of the particular service.

(2) Controlling interests.

(i) For purposes of this section, controlling interest includes individuals or entities with either de jure or de facto control of the applicant. De jure control is evidenced by holdings of greater than 50 percent of the voting stock of a corporation, or in the case of a partnership, general partnership interests. De facto control is determined on a case-by-case basis. An entity must disclose its equity interest and demonstrate at least the following indicia of control to establish that it retains de facto control of the applicant:

(A) The entity constitutes or appoints more than 50 percent of the board of directors or management committee;

A12

(B) The entity has authority to appoint, promote, demote, and fire senior executives that control the day-to-day activities of the licensee; and

(C) The entity plays an integral role in management decisions.

(ii) Calculation of certain interests.

(A)[*] Fully diluted requirement.

(1) Except as set forth in paragraph (c)(2)(ii)(A)(2) of this section, ownership interests shall be calculated on a fully diluted basis; all agreements such as warrants, stock options and convertible debentures will generally be treated as if the rights thereunder already have been fully exercised.

(2) Rights of first refusal and put options shall not be calculated on a fully diluted basis for purposes of determining de jure control; however, rights of first refusal and put options shall be calculated on a fully diluted basis if such ownership interests, in combination with other terms to an agreement, deprive an otherwise qualified applicant or licensee of de facto control.

---

[*]    Note to paragraph (c)(2)(ii)(A): Mutually exclusive contingent ownership interests, i.e., one or more ownership interests that, by their terms, are mutually exclusive of one or more other ownership interests, shall be calculated as having been fully exercised only in the possible combinations in which they can be exercised by their holder(s). A contingent ownership interest is mutually exclusive of another only if contractual language specifies that both interests cannot be held simultaneously as present ownership interests.

A13

(B) Partnership and other ownership interests and any stock interest equity, or outstanding stock, or outstanding voting stock shall be attributed as specified.

(C) Stock interests held in trust shall be attributed to any person who holds or shares the power to vote such stock, to any person who has the sole power to sell such stock, and to any person who has the right to revoke the trust at will or to replace the trustee at will. If the trustee has a familial, personal, or extra-trust business relationship to the grantor or the beneficiary, the grantor or beneficiary, as appropriate, will be attributed with the stock interests held in trust.

(D) Non-voting stock shall be attributed as an interest in the issuing entity.

(E) Limited partnership interests shall be attributed to limited partners and shall be calculated according to both the percentage of equity paid in and the percentage of distribution of profits and losses.

(F) Officers and directors of the applicant shall be considered to have a controlling interest in the applicant. The officers and directors of an entity that controls a licensee or applicant shall be considered to have a controlling interest in the licensee or applicant. The personal net worth, including personal income of the officers and directors of an applicant, is not attributed to the applicant. To the extent that the officers and directors of an applicant are affiliates of other entities, the gross revenues of the other entities are attributed to the applicant.

(G) Ownership interests that are held indirectly by any party through one or more intervening corporations

A14

will be determined by successive multiplication of the ownership percentages for each link in the vertical ownership chain and application of the relevant attribution benchmark to the resulting product, except that if the ownership percentage for an interest in any link in the chain exceeds 50 percent or represents actual control, it shall be treated as if it were a 100 percent interest.

(H) Any person who manages the operations of an applicant or licensee pursuant to a management agreement shall be considered to have a controlling interest in such applicant or licensee if such person, or its affiliate, has authority to make decisions or otherwise engage in practices or activities that determine, or significantly influence:

> (1) The nature or types of services offered by such an applicant or licensee;
>
> (2) The terms upon which such services are offered; or
>
> (3) The prices charged for such services.

(I) Any licensee or its affiliate who enters into a joint marketing arrangement with an applicant or licensee, or its affiliate, shall be considered to have a controlling interest, if such applicant or licensee, or its affiliate, has authority to make decisions or otherwise engage in practices or activities that determine, or significantly influence:

> (1) The nature or types of services offered by such an applicant or licensee;
> (2) The terms upon which such services are offered; or

A15

(3) The prices charged for such services.

\* \* \*

(5) Affiliate.

(i) An individual or entity is an affiliate of an applicant or of a person holding an attributable interest in an applicant if such individual or entity—

(A) Directly or indirectly controls or has the power to control the applicant, or

(B) Is directly or indirectly controlled by the applicant, or

(C) Is directly or indirectly controlled by a third party or parties that also controls or has the power to control the applicant, or

(D) Has an "identity of interest" with the applicant.

(ii) Nature of control in determining affiliation.

(A) Every business concern is considered to have one or more parties who directly or indirectly control or have the power to control it. Control may be affirmative or negative and it is immaterial whether it is exercised so long as the power to control exists.

Example. An applicant owning 50 percent of the voting stock of another concern would have negative power to control such concern since such party can block any action of the other stockholders. Also, the bylaws of a corporation may permit a stockholder with less than 50 percent of the voting stock to block any actions taken by the other stockholders in the other entity. Affiliation exists when the applicant has the power to control a

A16

concern while at the same time another person, or persons, are in control of the concern at the will of the party or parties with the power to control.

(B) Control can arise through stock ownership; occupancy of director, officer or key employee positions; contractual or other business relations; or combinations of these and other factors. A key employee is an employee who, because of his/her position in the concern, has a critical influence in or substantive control over the operations or management of the concern.

(C) Control can arise through management positions where a concern's voting stock is so widely distributed that no effective control can be established.

Example. In a corporation where the officers and directors own various size blocks of stock totaling 40 percent of the corporation's voting stock, but no officer or director has a block sufficient to give him or her control or the power to control and the remaining 60 percent is widely distributed with no individual stockholder having a stock interest greater than 10 percent, management has the power to control. If persons with such management control of the other entity are persons with attributable interests in the applicant, the other entity will be deemed an affiliate of the applicant.

(iii) Identity of interest between and among persons. Affiliation can arise between or among two or more persons with an identity of interest, such as members of the same family or persons with common investments. In determining if the applicant controls or has the power to control a concern, persons with an identity of interest will be treated as though they were one person.

A17

Example. Two shareholders in Corporation Y each have attributable interests in the same PCS application. While neither shareholder has enough shares to individually control Corporation Y, together they have the power to control Corporation Y. The two shareholders with these common investments (or identity in interest) are treated as though they are one person and Corporation Y would be deemed an affiliate of the applicant.

(A) Spousal affiliation. Both spouses are deemed to own or control or have the power to control interests owned or controlled by either of them, unless they are subject to a legal separation recognized by a court of competent jurisdiction in the United States. In calculating their net worth, investors who are legally separated must include their share of interests in property held jointly with a spouse.

(B) Kinship affiliation. Immediate family members will be presumed to own or control or have the power to control interests owned or controlled by other immediate family members. In this context "immediate family member" means father, mother, husband, wife, son, daughter, brother, sister, father- or mother-in-law, son- or daughter-in-law, brother- or sister-in-law, step-father or -mother, step-brother or -sister, step-son or -daughter, half brother or sister. This presumption may be rebutted by showing that the family members are estranged, the family ties are remote, or the family members are not closely involved with each other in business matters.

Example. A owns a controlling interest in Corporation X. A's sister-in-law, B, has an attributable interest in a PCS application. Because A and B have a presumptive kinship affiliation, A's interest in Corporation Y is attributable to B, and thus to the applicant, unless B rebuts the presumption with the necessary showing.

A18

(iv) Affiliation through stock ownership.

> (A) An applicant is presumed to control or have the power to control a concern if he or she owns or controls or has the power to control 50 percent or more of its voting stock.

> (B) An applicant is presumed to control or have the power to control a concern even though he or she owns, controls or has the power to control less than 50 percent of the concern's voting stock, if the block of stock he or she owns, controls or has the power to control is large as compared with any other outstanding block of stock.

> (C) If two or more persons each owns, controls or has the power to control less than 50 percent of the voting stock of a concern, such minority holdings are equal or approximately equal in size, and the aggregate of these minority holdings is large as compared with any other stock holding, the presumption arises that each one of these persons individually controls or has the power to control the concern; however, such presumption may be rebutted by a showing that such control or power to control, in fact, does not exist.

(v)[**] Affiliation arising under stock options, convertible debentures, and agreements to merge. Except as set forth in

---

[**] Note to paragraph (c)(5)(v): Mutually exclusive contingent ownership interests, i.e., one or more ownership interests that, by their terms, are mutually exclusive of one or more other ownership interests, shall be calculated as having been fully exercised only in the possible combinations in which they can be exercised by their holder(s). A contingent ownership interest is mutually exclusive of another only if contractual language specifies that both interests cannot be held simultaneously as present ownership interests.

A19

paragraph (c)(2)(ii)(A)(2) of this section, stock options, convertible debentures, and agreements to merge (including agreements in principle) are generally considered to have a present effect on the power to control the concern. Therefore, in making a size determination, such options, debentures, and agreements are generally treated as though the rights held thereunder had been exercised. However, an affiliate cannot use such options and debentures to appear to terminate its control over another concern before it actually does so.

Example 1 to paragraph (c)(5)(v). If company B holds an option to purchase a controlling interest in company A, who holds an attributable interest in a PCS application, the situation is treated as though company B had exercised its rights and had become owner of a controlling interest in company A. The gross revenues of company B must be taken into account in determining the size of the applicant.

Example 2. If a large company, BigCo, holds 70% (70 of 100 outstanding shares) of the voting stock of company A, who holds an attributable interest in a PCS application, and gives a third party, SmallCo, an option to purchase 50 of the 70 shares owned by BigCo, BigCo will be deemed to be an affiliate of company A, and thus the applicant, until SmallCo actually exercises its option to purchase such shares. In order to prevent BigCo from circumventing the intent of the rule which requires such options to be considered on a fully diluted basis, the option is not considered to have present effect in this case.

Example 3. If company A has entered into an agreement to merge with company B in the future, the situation is treated as though the merger has taken place.

(vi) Affiliation under voting trusts.

A20

(A) Stock interests held in trust shall be deemed controlled by any person who holds or shares the power to vote such stock, to any person who has the sole power to sell such stock, and to any person who has the right to revoke the trust at will or to replace the trustee at will.

(B) If a trustee has a familial, personal or extra-trust business relationship to the grantor or the beneficiary, the stock interests held in trust will be deemed controlled by the grantor or beneficiary, as appropriate.

(C) If the primary purpose of a voting trust, or similar agreement, is to separate voting power from beneficial ownership of voting stock for the purpose of shifting control of or the power to control a concern in order that such concern or another concern may meet the Commission's size standards, such voting trust shall not be considered valid for this purpose regardless of whether it is or is not recognized within the appropriate jurisdiction.

(vii) Affiliation through common management. Affiliation generally arises where officers, directors, or key employees serve as the majority or otherwise as the controlling element of the board of directors and/or the management of another entity.

(viii) Affiliation through common facilities. Affiliation generally arises where one concern shares office space and/or employees and/or other facilities with another concern, particularly where such concerns are in the same or related industry or field of operations, or where such concerns were formerly affiliated, and through these sharing arrangements one concern has control, or potential control, of the other concern.

A21

(ix) Affiliation through contractual relationships. Affiliation generally arises where one concern is dependent upon another concern for contracts and business to such a degree that one concern has control, or potential control, of the other concern.

(x) Affiliation under joint venture arrangements.

(A) A joint venture for size determination purposes is an association of concerns and/or individuals, with interests in any degree or proportion, formed by contract, express or implied, to engage in and carry out a single, specific business venture for joint profit for which purpose they combine their efforts, property, money, skill and knowledge, but not on a continuing or permanent basis for conducting business generally. The determination whether an entity is a joint venture is based upon the facts of the business operation, regardless of how the business operation may be designated by the parties involved. An agreement to share profits/losses proportionate to each party's contribution to the business operation is a significant factor in determining whether the business operation is a joint venture.

(B) The parties to a joint venture are considered to be affiliated with each other. Nothing in this subsection shall be construed to define a small business consortium, for purposes of determining status as a designated entity, as a joint venture under attribution standards provided in this section.

(xi) Exclusion from affiliation coverage. For purposes of this section, Indian tribes or Alaska Regional or Village Corporations organized pursuant to the Alaska Native Claims Settlement Act (43 U.S.C. 1601 et seq.), or entities owned and controlled by such tribes or corporations, are not considered affiliates of an applicant (or licensee) that is

owned and controlled by such tribes, corporations or entities, and that otherwise complies with the requirements of this section, except that gross revenues derived from gaming activities conducted by affiliate entities pursuant to the Indian Gaming Regulatory Act (25 U.S.C. 2701 et seq.) will be counted in determining such applicant's (or licensee's) compliance with the financial requirements of this section, unless such applicant establishes that it will not receive a substantial unfair competitive advantage because significant legal constraints restrict the applicant's ability to access such gross revenues.

\* \* \*

(j) Designated entities must describe on their long-form applications how they satisfy the requirements for eligibility for designated entity status, and must list and summarize on their long-form applications all agreements that affect designated entity status such as partnership agreements, shareholder agreements, management agreements, spectrum leasing arrangements, spectrum resale (including wholesale) arrangements, and all other agreements, including oral agreements, establishing, as applicable, de facto or de jure control of the entity or the presence or absence of impermissible and attributable material relationships. Designated entities also must provide the date(s) on which they entered into each of the agreements listed. In addition, designated entities must file with their long-form applications a copy of each such agreement. In order to enable the Commission to audit designated entity eligibility on an ongoing basis, designated entities that are awarded eligibility must, for the term of the license, maintain at their facilities or with their designated agents the lists, summaries, dates, and copies of agreements required to be identified and provided to the Commission pursuant to this paragraph and to § 1.2114..

\* \* \*

(n) Annual reports. Each designated entity licensee must file with the Commission an annual report within five business days before the anniversary date of the designated entity's license grant. The annual

A23

report shall include, at a minimum, a list and summaries of all agreements and arrangements (including proposed agreements and arrangements) that relate to eligibility for designated entity benefits. In addition to a summary of each agreement or arrangement, this list must include the parties (including affiliates, controlling interests, and affiliates of controlling interests) to each agreement or arrangement, as well as the dates on which the parties entered into each agreement or arrangement. Annual reports will be filed no later than, and up to five business days before, the anniversary of the designated entity's license grant.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with Federal Rule of Appellate Procedure 32(a)(7) because it contains 12,682 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point New Century Schoolbook LT Std.


Dated: February 2, 2024              /s/ Daniel Woofter_____
                                     Daniel Woofter

**CERTIFICATE OF SERVICE**

I hereby certify that on February 2, 2024, I caused this document to be electronically filed with the Clerk of Court by using the electronic filing system, which will send a notice of electronic filing to all parties who have registered with the electronic filing system.

Dated: February 2, 2024                    /s/ Daniel Woofter
                                           Daniel Woofter